The first appeal is Docket Number 24-1384, KIOXIA Corporation v. Viasat. Mr. Hawes. Thank you, Your Honor. May it please the Court. I'll start with jurisdiction. After the reply brief was filed, Viasat filed a motion to expedite proceedings in which it did make a comment about Claim 16, so I just wanted to bring that to the Court's attention. As we stated in our reply brief, the case that has the dispute over entrenchment was narrowed to Claim 16. We originally appealed more than Claim 16. At that time, it hadn't been narrowed. Obviously, time has gone by. But I did want to identify for the Court that on page 3 of the motion to expedite, which is Document 34 of the record, Viasat stated that Claim 16 is the sole You're talking about a motion to expedite in the district court, right? No, in this court. In this court. I'm not even familiar with this motion. I'm sorry. Well, I'm glad I'm bringing it to your attention, Your Honor. So this was, I mean, it was filed before, obviously, this was set for hearing. So, and it was denied. So this was back at the beginning of this year, I believe. I think it was January. But in any case, they took, it was post our reply brief, which is why I want to raise it, because our reply brief, you know, talked about jurisdiction. I just want to update the Court on what has happened since our reply brief before I get to the merits. I know the Court wants to be confident of its jurisdiction before addressing an appeal. So in that motion to expedite, Viasat stated that Claim 16 of the 700 patent, they identified that as the sole claim that Viasat planned to assert at trial. We believe that we still have an apprehension of suit, and that that language is not enough, is not clear enough for Keosha to believe that it is not subject to Viasat asking to expand the claims in the district court. And therefore, we believe this Court, we have standing to appeal as a Petitioner, and that this Court has jurisdiction as a result to decide the claims that are still live, some were obviously canceled, but those live claims are Claims 2, 10 to 14, 16, and 23 to 25. 15 is gone. 15 has been canceled. All the independent claims were canceled, Your Honor. Okay. Well, what is the effect, carrying this idea of events changing as we go through the post-briefing process, what is the effect on Claim 16 of the cancellation of Claim 15, if any? Is there any collateral estoppel effect? Does it narrow the scope of our review? Or what does it do to our consideration of Claim 16? Your Honor, I believe this Court is still reviewing the judgment of the PTAB. And the judgment of the PTAB was that Claim 16 was not in that, was not unpatentable. The judgment of the PTAB was also that Claim 15 was not unpatentable, but we believe that decision is now moot. But for Claim 16, I believe we look at the judgment of the PTAB with regard to Claim 16 and see whether that analysis still holds up in determining whether or not that should be vacated and remanded. But the way the universe looks right now, Claim 15 is gone. It has been deemed invalid. Does that have any effect on Claim 16 for our purposes? Your Honor, I don't believe for the purposes of this appeal that it does. Obviously, it would have an impact on damages and other issues with Claim 16 if this were an appeal from an infringement finding. But because we're in an appeal from a PTAB, which is just looking at the subject matter as a whole of Claim 16, which was asserted to be obvious by Kiosha below, I believe we look at that subject matter as a whole in view of the grounds raised in this particular proceeding. Keep in mind, Claim 15 was invalidated based on the grounds in another proceeding, which Viasat then did not appeal. So I think this is independent. So in the sense we're still in the bubble of this appeal, in the sense that for you to succeed in your attack on Dependent Claim 16, you still need to win your arguments as to why the Lee reference teaches all the elements of Claim 15. Well, Your Honor, I think I need to win on showing that the PTAB erred. PTAB only discussed one of the limitations of 15. So I don't believe that. In terms of your overall goal of finding Claim 16 unpatentable, it's contingent on you, if you were to get a remand, to succeed in proving that, in fact, this Lee reference discloses all the elements of Claim 15. I agree with that, Your Honor. Well, if we get a remand, we're challenging what the PTAB did here. But if we get a remand, we still have the grounds of our petition that, as the Supreme Court and this Court have said, bind the IPR. And we would need to act within the grounds of our petition and this Court's decision in order to establish that Claim 16, which includes all the limitations of Claim 15, was PTAB's obvious subject matter. So moving specifically, given the amount of time I have, I am going to focus on Claim 16. It's really important here to look at Claim 1 versus Claim 15. And especially the fact that the PTAB did that in the institution decision and recognized that they're critically different. This is not a situation where the PTAB all along said, Claim 1, Claim 15, you know, they're really the same thing. Instead, what the PTAB specifically said, and this is in the appendix at page 333, is that Petitioner's contention for Claim 15 does not appear to suffer from the same deficiencies as Petitioner's claim to challenge to Claim 1. That's important because that same analysis for Claim 1 that the PTAB put forward in the institution decision was the same claim construction analysis they put forward in the final decision. But then when we get to the final decision, all of a sudden the PTAB says, oh, and Claim 15 just follows along with Claim 1. So in the institution decision, they're very different. In the final decision, all of a sudden they're one and the same for purposes of this question of decoding. And the language in the claims truly is different. So Claim 1 talks about a decoding module and talks about partially decoded data streams. Claim 15 does not have the decoding module and does not have partially decoded data streams. I thought the board focused on the use of the term decode in Claim 1 and decoder in Claim 15, and based on extrinsic evidence, found that those terms have a very, very well established meaning in the art, and that in the end there was nothing in the specification that clearly displaced that very well established meaning for terms like decode and decoder. All right. So if we turn to what the actual analysis in the decision as to claim construction, you'll see that starts on appendix page 13. After considering the party's submissions, we are persuaded that the construction in the institution decision is correct. That's in the middle of that page. And what it's discussing there, as it admits earlier on, is specifically Claim 1. So under C, claim construction, they say, below we address the party's dispute about the meaning of one phrase in Claim 1. This is on page 12. So that's in the middle of page 12. The PTAB is very specific. They're talking about a phrase in Claim 1. And that's what they're construing, not Claim 15. And that's important, because Claim 15 doesn't have, never says decoding, never has the function of decoding. And the language that's actually at issue that the PTAB relied upon is just retrieving. It's not decoding. And it's not retrieving partially decoded data streams. It's just decoding data streams. And when you look at the patent, and especially the summary of the patent, you'll see that that makes sense in view of what the patent said the invention was. So the summary only refers to decoding or decode in one spot, which is the second sentence of the summary. So this is in column number 1, starting at line 31. So this is the only reference in the summary to this. And the sentence, the key part of that sentence, is actually the parenthetical. Because the parenthetical says, which may, but need not, be partially decoded. It's referring to these data streams. Claim 15 is the claim where it's not partially decoded. So if that language in the summary is to have any meaning, it must mean that Claim 15 is not limited in the way that the board found Claim 1 was limited. But despite that, the board just says, well, for the same reasons as Claim 1, we find Claim 15 doesn't meet this decoding. The language is not there. It's not in their analysis of claim construction. And it runs straight into the summary that says, it need not be partially decoded. So for Claim 15 to have the scope of the summary. We don't see anything in the spec that actually makes a comment on the meaning of the term decoder. Decoder is the actual term used in Claim 15, right? Well, Your Honor, it is the term that's used as the top-level term. So it's important here to note that there is a decoder in Claim 15, Your Honor. That's right. And then it is configured to, and it does a number of things. The only thing the board relied on is the very first function that it's configured to do.  The retrieve function. What do you think is wrong with the board's construction of the term decoding? You took issue with the board's construction as being too narrow. And it struck me, distinguishing between error, error correction and information bits, was at least a pretty accurate description of what decoding entails. What's missing in your view? Well, Your Honor, first of all, I would say that only applies to Claim 1. It does not apply to Claim 15, which doesn't have the language of decoding. But I'll address your question. It doesn't say decoding, but presumably I think we can infer, at least it's likely, that the term decoder is something that at minimum does decoding. Well, Your Honor, frankly, given the language in the summary, I don't think we can infer that. The summary specifically talks about the fact that it need not decode. That's in the second sentence of the summary. It says, which may but need not be partially decoded. Partially decoded. Right. So it need not be partially decoded. But where in that sentence does it tell us that's how we understand the term decoder? Well, Your Honor, that is the only sentence that's referring to the function that the board relied upon. You know, the board relied upon retrieving data to form a plurality of data streams. That's the language the board relied upon. And this is the sorry, go ahead. Go ahead. And this is, this language goes directly to that portion of Claim 15, and it says need not be partially decoded. But if a decoder does not need to decode, then what is the definition in your view of decoder? Your Honor, in Claim 15, the decoder allows that the detectors, which is, remember, also part of the function in Claim 15 ascribed to the decoder, that it can be the detectors which in the process step are detect, they are each of the submodules are, where each error detection submodule is configured to detect whether a portion of the respective receipt stream contains an error. The decoding can occur there. So it sounds like your position is that the term decoder, as it's used in Claim 15, is defined by the functions recited in the claim itself. Yes, Your Honor. I mean, it says it's a decoder configured to do one, two, quite a few. I think it's eight different functions. And so what's not required is things that we ordinarily attribute to decoder as a baseline function. Well, Your Honor, I certainly would say it's not required by one of the eight steps. You don't have to read decoder into every one of the eight steps. So it would be improper, especially here where Claim 1 talks about partially data streams, to read decoder into the retrieve language to erase that distinction. There's a distinction between Claim 1 and Claim 15, which the board recognized in its institution decision, but then decided to erase in its final decision. And we shouldn't read decoder into every one of these functions in order to erase the distinctions between Claim 1 and Claim 15, especially where the summary of the convention says it need not be partially decoded at that stage, that retrieval stage, where we're creating a plurality of data streams. Do you believe near buffering could be decoding? Your Honor, for Claim 1, I believe that's relevant. And I do believe that if you look at the language in the specification, it says that buffering and certain aspects of the decoding are alternatives within this convention. So it's unusual, but that is what it says. You're talking about Column 6? Yes. Where it uses or, but then later it also uses eg. Right? Two terms that this court has said. Column 6 mentions it's one embodiment, right? That's right. So that's only one embodiment. There might even be others. So buffering might be one embodiment. There might be others as well. But that particular embodiment specifically says buffer, deinterleave, or perform certain aspects of the decoding process. So buffering is an alternative to performing certain aspects of the decoding process. And that's consistent with the summary that says, need not be partially decoded. Right? Those line up between the summary and that particular discussion of an embodiment. I am well into my rebuttal unless the panel has other questions. No. We'll give you minutes for rebuttal because we had that housekeeping issue in the first few minutes. Thank you, Your Honor. Let's hear from the other side. May I please? Can you clarify addressing the housekeeping point that the opposing counsel raised in terms of which claims we would need to address in any decision? Absolutely. So we agree that there is standing here. There is no formal decision or formal stipulation from the district court dismissing with prejudice any of the dependent claims. So with respect to the dependent claims, we agree that there is standing. With respect to the independent claims, Claims 1, 15, and 17, those have been canceled. So we believe the appeal with respect to those is moot. However, the board's decision regarding Claims 1, 15, and 17 is what drives this appeal. And so it's still proper to be discussing those. But what about any potential collateral estoppel effects of the determination that's now final that Claim 15 is not valid, or at least it's been canceled, it no longer exists? How should we look at that question with regard to the viability of Claim 16? Certainly with respect to those claims, we could not assert those in a district court proceeding. Right. But doesn't 15, the fact that 15 has been declared invalid, doesn't that affect our analysis of Claim 16? Nobody talks about this in the briefs, but I'm very interested in hearing what you have to say. No, I don't think the cancellation of Claim 15 in the separate proceeding affects the analysis here, because what the board was tasked with was to take Keoxia's arguments, consider those arguments, and whether Lee, the reference, meets all of the limitations of Claim 15 and Claim 16. So the fact that the board found that Lee doesn't disclose all of those elements is what we should be focused on right now for Claim 16. Just curious, in the other IPRs, which ultimately led to Claim 15's cancellation, was Lee the reference that was used? Lee was not the reference used in that IPR. For Claim 15. Correct. Okay. Just curious, what was the name of the reference? You're testing me here. Okay. Not Lee. It was not Lee. Okay.  Maybe that's all I need to know. Yeah, I apologize. I can certainly sit down. As long as it's not Lee. It is not Lee. Okay. That's fine. But just for, to put a fine point on it, can you specify the specific claims that you think we need to have addressed in terms of any decision that we're making? Absolutely. By claim number. I just want to make sure I've got the list and see if it's consistent with what opposing counsel said. Yes. The claims are Claims 2, 10-14, Claims 16, and Claims 23-25. You're not disclaiming any of them, right? We are not disclaiming any of them. Okay. No, Your Honor. So we could have a situation in which Claim 15 has been canceled and held conclusively by the board, by the PTO, to be invalid, and yet we could then rule, nope, it's valid. We're not asking you to rule that Claim 15 is valid. But that's the consequence of your argument, right? No, we're asking you to rule that Claim 16 is not invalid on the basis that Keoxia put forward in its petition. Right. But you're not making a separate argument with respect to the feature of Claim 16 that was added in the dependent claim. You're making an argument which is entirely predicated, as I understand it, on Claim 15. That's correct. But that's based on what Keoxia chose to appeal in this petition. You understand my concern. I do. I do understand your concern. I'm still not satisfied that we have a good handle on what we should be doing about the fact that this claim, which is the focus of this appeal, is gone. I would argue that the claim that we're focused on is not gone. I understand that I'm not... But it's gone and it's canceled. It doesn't exist. It's a... But Claim 16 is not gone and is not canceled, Your Honor. Okay. I guess the idea is the reference or references that were used to teach all of the elements of Claim 15 are not here in front of us today. So we can't somehow rely on and use those other not-Lee references in the context of the challenge that we have in front of us today, which is whether the references asserted here, i.e. Lee, in fact, has enough to disclose all the elements of Claim 15 and, I guess, Claim 16. Yes. That's exactly correct. Could you also address this whole connection, potentially, between decode and decoder? Because we've been talking about both Claims 1 and 15. I just want to get your take on that in particular. Yes. So the only issue that is actually in front of this Court with respect to decode and decoder is whether the Board correctly construed decode, the encoded data. That's a term that does not appear in Claim 15. And counsel from Keoxia says the same thing, which means that changing the construction of decode can have no effect on Claim 15. And all of the arguments that we heard from counsel today with respect to Claim 15 and, therefore, Claim 16 are entirely waived. These are brand-new arguments that appear for the very first time in their reply brief. So the Court need not reach any of those. Let me ask you about the term communicatively coupled between the decoder and the flash memory. The Board said, no, not be communicatively coupled because there is a buffer in between the flash memory and the decoder. Now, why is it not the case that the communicatively coupled can have something between two items and they can still be communicatively coupled, whether it's a wire or a signal or a signal-carrying device of any sort? What does it matter that it's a buffer? I mean, you would agree that if all there was between flash memory and the decoder was a wire, then you would never argue that, well, it's not communicatively coupled. Why does the fact that it's a buffer matter? So I don't think that the Board was actually focused on the term communicatively coupled. And I agree that there could be pieces between the flash memory and the decoder and those things could still be... before the Board, at least in the reply brief of the now appellant petitioner, right? Certainly. So the Board effectively rejected that, as I recall. I disagree with that. I think what the Board rejected was that Lee does not retrieve encoded data from flash memory. That's different from the communicatively coupled language because what it requires is a specific component,  to pull something, specifically the encoded data, from a specific place, the flash memory. And the Board found that Lee doesn't teach that because in Lee, the decoder only pulls data from the page buffer. So it's not pulling data from the right place. But if the page buffer is doing nothing except interposing itself between the flash memory and the decoder, then it would seem to me that when the decoder calls for information from the flash memory, it goes through the buffer and into the decoder. That seems to me a kind of hyper-technical point, I guess I would say. Yeah. So this is an interesting point because actually in Lee, there is a whole other component called a channel controller that is actually responsible for pulling data from the flash memory and getting it into the page buffer. So it's not the decoder 530 of Lee at all that is responsible for that action. And Keoksea's expert testified to that effect. Did the Board rely on that? The Board did not, but it made... My understanding was the Board said the problem with the petitioner's argument is that Lee's decoder is not retrieving the encoded data directly from the flash memory. Yeah, nowhere directly. It's bolded, it's italicized, it's quite clear what the reasoning is of the Board. And so, because in its view, it's retrieving the data from the page buffer. And so there's a failure in the reasoning here. And so I think I have the same question as Judge Bryson, which is where did this directly notion come from? If the page buffer really is nothing more than a pass-through, kind of a component. Well, I think you're correct that the Board didn't explicitly reach this question about the channel controllers, the alternative mechanism by which data is retrieved. But it made two undisputed factual findings that are very related. First, it did make the factual finding that decoder 530 doesn't pull data from the flash memory. It only pulls from the page buffer. And then it also made the factual finding that is undisputed that the page buffer is nothing more than a passive repository. So, neither of the components that Keoxia pointed to in its petition as potentially, or in its briefing, as potentially being relevant to retrieval of data from flash memory are actually retrieving data from flash memory. And that's because in Lee a separate component does that. That still doesn't quite directly answer my question about where the board got the word directly from in terms of adding that to the claim when it comes to a decoder retrieving data from the flash memory. And why couldn't you still satisfy the claim if there was some so-called intermediary component such as something relatively minor like a buffer. It has a in between the flash memory and decoder such that one could still find,  the decoder is getting data. Where is it getting data from? It's really getting it from the flash memory. I think if that were the  in front of the board then maybe our briefing would have been different and we would have been having a different discussion. I guess you would say none of this that I'm asking about is actually contained in the blue brief. That's correct and much of this is also not contained in Keoxia's IPR petition. Right, but I believe petitioners are permitted to respond to claim construction arguments that are raised in the patent owner's response and that's really all the petitioner did in his reply is to say oh, if the claim really means what the patent owner says and we disagree with that well then here nevertheless here's why the Lee reference nevertheless is retrieving data from the flash memory. Certainly, but patent owner didn't present this as a claim construction argument. We simply pointed out the factual the predicate that Lee doesn't operate in this way and then petitioner's  was to change the way that it was mapping Lee to the claims and the board found that that was a new argument and declined to consider it. Could we get back to decoder for a little bit?  I understand your position is oh, decoder, claim 1, claim 15, they're all stand or fall together and but if we could just get to the merits a little bit more about how to understand decoder. You heard Mr. Hawes earlier reference sentence in the summary of the invention and then refer back to now what the language in claim 15 itself and then try to draw a connection that when it comes to decoder as used in claim 15 we're not so concerned anymore about distinguishing error correction bits from information bits what we're really caring about is retrieving encoded data and then doing the processing steps that are actually recited in the claim. Could you respond to that in terms of whether there is any daylight between how to think about decoder in this patent compared to just the term decode in claim 1? So I think a decoder much like the word decode would have a meaning to a person of ordinary skill in the art and as the board found with respect to decode decode means more than just buffering it means distinguishing error correction bits from error detection bits and so when we think about a decoder we  perform some of that function that's a necessary part of decoding and if we look at the  in claim 15 some of these other steps talk about the decoding process not using exactly the same language but for example processing a different one of the plurality of data streams that processing is also seen in claim 6 or in column 6 where we are talking about the detection and correction of errors steps that's the kind of processing that claim 15 is talking about not breaking down the data to recover the data from how it was encoded well that's a necessary part of the error correction and detection steps is to reconstitute the data correlate the correction bits with the detection bits and only then can you carry on to process it let me ask you then turning back to column 6 and lines whatever it is 10 through 14 I think is the key language there's some language later in the column but that's not as central I think to the opponent's  how do you read may buffer interleave or perform certain aspects of the decoding process I take it that you read that not to permit buffering by itself to  decoding is that right if it's right how do you square that with the use of the  R in a way that would appear to be in the disjunctive I read that as three need perform take R disjunctive sense one one which present could be not the best reading do you think this was clumsy I think clumsy that's hard to write opinion certainly this can be disregarded clumsy I don't think we need to disregard it because it's clumsy I think what we need to the way to consider this is the board found that there's a plain and ordinary meaning of the term decode that does not encompass buffering alone and so then the question is should we depart from that plain and ordinary meaning that both parties agree on and the only reason that we would depart from it is if there's lexicography there's not lexicography here Keoxia has never argued that there's lexicography and they even agree that the lexicography requires that you say we are now going to give you a definition of this term and we've frequently said that look there's language in the specification that tells us what this word means and you might run into a sentence just like this that says X or Y or Z and you say that's pretty clear what the patentee had in mind was it was one of those three but Keoxia agrees that this sentence that we're talking about does not do that it does not define or redefine decoding different from how a person of ordinary skill in the art would consider it and their argument nevertheless is that column six should channel our thinking into how to understand what a decoder really is for purposes of the claimed invention sure but I don't think a single clumsy sentence in a specification can meet the exacting standards of lexicography and I think the next that's what we'll have to write in the opinion no the next sentence or the next part of the passage the lower part shows that all this is doing is giving examples of things that a decoder module processor can do and that's entirely consistent with what both parties agree there's no disagreement that buffering could be part of a decoding process it's just buffering alone is not sufficient and so there's nothing inconsistent with a buffer or with a decoder module processor being capable of doing some buffering and that's all these sentences are set what is your best support for buffering alone cannot equal decoding like what would you point me to as your best support I would point to appendix page 14 there is testimony of Keoxias expert that says decode might include buffering but buffering by itself would not be considered decoding to a  of ordinary skill and also on appendix pages 14 and 15 there's other evidence that the definition would be a departure from the plain and ordinary meaning that a person of  would understand is that all extrinsic support you're pointing to intrinsic yes that's all extrinsic support but this is a factual finding that the board found well to put a finer point on judge Cunningham's question is there something in the intrinsic evidence something in the patent that provides some context that might guide us away from the appellant's position as to how best how to best understand this particular passage in column six there isn't a specific example or any specific language in the patent that says this is what the term decode means to a person of skill in this art that's because it's a well of skill in this art would understand Recognizing there's no specific language is there any language you want to point you to in the specification that would help your  I think the sentences that we've been talking about are my argument that these are merely examples of things that a  module processor are capable of doing one is buffering which could be part of a decoding process the other are things that could also be part of a decoding process and there's an example that decoding must be an example of buffering decoding or buffering alone is an example of  okay thank you very much thank you Mr. Hawes you have five minutes I won't tempt fate by saying I won't use it all okay three points first point looking at that extrinsic evidence not only is it extrinsic but if you look on appendix page 14 at the beginning of Dr. Korolek's testimony so this is about oh ten lines up it says petitioner's expert Dr. Korolek agrees aside from the 700 pattern right he's talking about he was asked you know he was asked ignore the 700 pattern then what does it mean and he says aside from the 700 pattern so the fact that there's no intrinsic evidence that's supporting this and the extrinsic evidence is specifically well aside from that pattern here's what it would mean under this court's law you don't go with aside from the pattern this court has said the only ordinary meaning that matters is the ordinary meaning in the context of the intrinsic evidence that's true but we've also said many times that when there's a well established technical definition in the art then we presume that the claim is using that backdrop understood definition unless it's clear that the patent drafter sought to displace that  based on something said in specification generally we talk we call that lexicography and I'm hearing that you're not really relying on lexicography per se so in the end it sounds like you're really counting on this sentence in column 6 to displace the backdrop understanding of the coder your honor it isn't a single clumsy sentence I would also point the court in column 6 to the point sorry later it says something but not quite as crisply well it says EG and this court has often said EG is examples it's certainly not an and it also says etc so this is your honor this is down at looks like lying around 50 you'll see there's a parenthetical it's referring to what's happening to create these data streams and it says EG so we're talking about examples here for example buffered deinterleaved decoded to some extent etc these are examples it's not just one clumsy thing at the top of the column we've got it reiterated down here below this court's law talks about or and EG with the same brush of the pen these are the words used by the folks writing these patent applications to indicate what are examples and believe me when they want to show infringement they rely on this to say hey each of those that's part of what we've got here the other thing I'll point out is that council agreed that there are steps in claim 15 the processing step specifically performed by the  where there may well be decoding going on but that doesn't and that actually supports the idea that you don't import it into the retrieving step which is what the board did right the board took decoder and said oh well then the retrieving step must include some decoding but we just heard that the processing step which is one of the things the decoder does in claim 15 may well include decoding or what was discussed as it has to happen you have to separate these bits to do the detecting that is part of the processing step and what that means is that there is no reason for the board contrary to the language in the summary and the language in two spots in column 6 to say hey decoder means that the retrieving language the retrieving language I guess that takes us back to what is Lee's page buffer 504 really disclosing I mean there's really nothing there to suggest that the page buffer is doing some of this you know well understood decoding action well it goes to the NAND and it pulls data and we know it takes one line and it creates multiple lines that's the retrieving step we did not identify the page buffer for the processing steps the board never reached the processing steps we have no analysis of the board as to whether Lee shows the processing steps or not that's further down in figure 5b the board never reached it because the board said oh well there's no retrieving of  because for the same reasons as claim 1 which makes no sense when claim 1 talks about a decoding module talks about the language that the board actually construed and then the board just applies that to claim 15 where the language is different would you agree that there is no argument in your blue brief as to the directly construction of claim 15 we agree that what happened in reply was yes I'm giving you yes and then I'm explaining in our reply at the P tab we said two things this is not a good claim construction but even if there's this directly requirement that would just mean that the page buffer is part of the decoder and it would still meet all the requirements under this new construction and the problem is that the board just said well look at claim 1 and that doesn't work either with claim 1 having totally different claim language than claim 15 so we focused on that on  we did not focus on the claim construction question you're identifying thank you very much I think we're out of  thank you the case is adjourned